IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
LAREDO DIVISION

MARIO A. TORRALBA,          §
                            §
          Plaintiff,        §
                            §
VS.                         §
                            §
JANET NAPOLITANO, *in Her*  §     Civil Action No. L-08-83
*Official Capacity as Secretary*  §
*of U.S. Department of Homeland*  §
*Security*,                 §
                            §
          Defendant.        §


MEMORANDUM AND ORDER

Plaintiff Mario A. Torralba sues Defendant Janet Napolitano, Secretary of Homeland Security, for gender discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. §§ 2000e to 2000e-17. (Dkt. 1.) Napolitano is sued in her official capacity, and she is represented by the Government. (Dkt. Nos. 1, 8, 32.) In 2006, Torralba was employed as a seized property specialist in the Laredo, Texas, field office of United States Customs and Border Protection ("CBP").[1]  (Dkt. 28-3 at ¶ 5.) That year, Torralba was passed over for a position as supervisory seized property specialist ("S-SPS") at the Port of Laredo. (Id. at ¶¶ 33-36.)

---

[1] Torralba indicated he was still employed as a seized property specialist in a declaration dated October 8, 2010. (Dkt. 40-5 at ¶ 4.)

Torralba alleges that he was not selected for the S-SPS position because of his gender and in retaliation for an Equal Employment Opportunity ("EEO") complaint he filed in 2002. (Dkt. 1 at ¶¶ 49–50, 75–90.)[2] The Government has moved for summary judgment on both the discrimination and retaliation claims. (Dkt. 27.)

## I. SUMMARY JUDGMENT STANDARD

The Court should render summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 322–23 (1986); Little v. Liquid Air Corp., 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc). The Court must review the evidence and draw inferences from it in the light most favorable to the nonmoving party. Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 412 (5th Cir. 2003). At the summary judgment stage, "courts are required to view the facts and draw reasonable inferences 'in the light most favorable to the party opposing the [summary judgment]

---

[2] Torralba's Complaint alleges that he suffered other acts of retaliation after filing his 2002 EEO complaint. (Dkt. 1 at ¶¶ 75–90.) However, in his response to the Government's summary judgment motion, Torralba states that his two theories of recovery are that he was not selected for the S-SPS position because of his gender and in retaliation for the 2002 EEO complaint. (Dkt. 37 at 2–3.)

motion.'"  <u>Scott v. Harris</u>, 550 U.S. 372, 378 (2007) (quoting <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655 (1962) (bracketed material in original)).  However, facts "must be viewed in the light most favorable to the nonmoving party only if there is a 'genuine' dispute as to those facts."  <u>Id.</u> at 380. "'[T]he mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact.'"  <u>Id.</u> (quoting <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986)).  "The non-moving party must do more than simply deny the allegations raised by the moving party."  <u>Bradley v. Allstate Ins. Co.</u>, 620 F.3d 509, 516 (5th Cir. 2010) (citing <u>Donaghey v. Ocean Drilling & Exploration Co.</u>, 974 F.2d 646, 649 (5th Cir. 1992)).  "Rather, the nonmovant must come forward with competent evidence, such as affidavits or depositions, to buttress his claims."  <u>Id.</u> [3]

## II. BACKGROUND

In 1992, Torralba began working as a customs inspector for the United States Customs Service, then part of the Department

---

[3] The background set forth below accordingly reflects the facts that can be reasonably drawn from the parties' admissions and the admissible evidence in the record, viewed in the light most favorable to Torralba.  It does not constitute findings of fact for any purpose other than determining whether the Government is entitled to summary judgment on the current record.

of the Treasury.  (Dkt. 40-1 at 3; Dkt. 37-3 at ¶ D.)  In 1995, he became a seized property specialist at the Port of Laredo. (Dkt. 28-3 at ¶ 5; Dkt. 40-1 at 1, 8; Dkt. 37-3 at ¶ G.)  Since 1998, Torralba's third-level supervisor has been Port Director Eugenio Garza, Jr.  (Dkt. 37-2 at 1:16-34.)  As port director, Garza supervises over 700 employees.  (Dkt. 37-2 at 2:27.)  In an undated declaration submitted with his March 22, 2010, response to the Government's summary judgment motion, Torralba avers that "from the inception of my employment as a [seized property specialist] within the Port of Laredo from 1995 to 2006, all of my supervisors and directors have been females." (Dkt. 37-3 at ¶ N.)  That declaration also states, "Most, it [sic] not all of these were promoted to supervisory [sic] by [Garza]."  (Id.)  In a 2007 declaration, Port Director Garza concedes that "all managers within the CBP Seized Property Section (PSS) are female."  (Dkt. 37-2 at 4:114-15.)

### A. Torralba's 2002 EEO Complaint

Sometime in 2002, Torralba filed an EEO complaint against Paul O'Neil, then Secretary of the Department of the Treasury.[4]

---

[4] The parties agree that Torralba submitted an EEO complaint in 2002.  (Dkt. 1 at ¶ 76; Dkt. 28-3 at ¶¶ 27-28, 67(a).)  However, the precise date it was submitted is disputed.  (Dkt. 28-3 at ¶ 67(a)).  The record does not include a copy of the 2002 EEO complaint, and neither party has submitted other evidence of the day it was submitted.

(Dkt. 27-1; Dkt. 1 at ¶¶ 76-77; Dkt. 8 at ¶ 2.)   Torralba complained that he suffered sex-based discrimination when:

> (1) "he was issued a Letter of Reprimand for failure to obtain written approval prior to engaging in outside employment";
>
> (2) his "supervisor attempted to deny him previously approved leave"; and
>
> (3) he "was not ranked best qualified for and was not selected for the position of Supervisory Customs Inspector . . . ." (Dkt. 27-1 at 3.)[5]

The record of the resulting EEO investigation includes an affidavit from Garza, dated October 30, 2002. (Dkt. 37-1.)   It states that Garza had known Torralba for about ten years, and that he had met with Torralba regarding a complaint that Torralba had engaged in unauthorized outside employment. (Dkt. 37-1 at 5-6.)   The affidavit also states that Garza was responsible for reviewing "the 30 individuals on the Best Qualified List" for the Supervisory Customs Inspector position and selecting 12 for further consideration. (Id. at 9.)   Garza averred that Torralba's name did not appear on the best qualified list and that he did not know Torralba had applied for the position. (Id.)   Garza further stated that he had been informed of Torralba's EEO complaint in the Summer of 2002. (Id.)

---

[5] The account of his grievances above is quoted from the Equal Employment Opportunity Commission's June 26, 2003, findings of fact and conclusions of law regarding Torralba's 2002 EEO complaint, issued by Administrative Law Judge Laura Alderman. (Dkt. 27-1.)

On March 1, 2003, the Customs Service was transferred to
the Department of Homeland Security ("DHS"), and the Customs
Service's personnel and functions were distributed among CBP and
Immigration and Customs Enforcement.[6]  The Customs Service's Port
of Laredo staff became part of CBP's Laredo Field Office.   On
June 16, 2003, the Equal Opportunity Commission's administrative
judge responsible for hearing Torralba's EEO complaint rendered
judgment in favor of DHS.  (Dkt. 27-1 at 6.)

### B. 2002 to 2005: Torralba Applies for Other Positions

In the undated declaration submitted with Torralba's March
22, 2010, response to Government's summary judgment motion, he
avers that from 2002 to 2005, he applied for several positions
through the Government's "USAJOBS" website.  (Dkt. 37-3 at ¶ O.)
"All, if not most [sic] of those jobs were in the port of Laredo
or, [sic] in facilities under [Garza's] supervision."  (Id. at
¶ Q.)  Torralba was not selected for any of these positions, and
"[m]ost, if not all of the employees selected . . . were
female."  (Id.)  Torralba names four particular women who were
selected for positions instead of him during the 2002 to 2005

---

[6]  See 6 U.S.C. §§ 203, 542; Pub.L. 107-296, §§ 4, 1502, Nov. 25,
2002, 116 Stat. 2142, 2308; Executive Office of the President,
Department of Homeland Security Reorganization Plan 4 (Nov. 25,
2002), available at http://www.dhs.gov/xabout/laws/publication_0004.shtm;
see also Department of Homeland Security, History: Who became
part of the Department?,
http://www.dhs.gov/xabout/history/editorial_0133.shtm.

period.   (Id.)   He also states, "It is my understanding that [Garza] participated in the selection and or hiring of those females."  (Id.)   In his 2007 Declaration, Garza avers that he does not know whether Torralba applied for positions between 2002 and 2005, though he does recall "his name being on one register for a position" for which Torralba was not selected. (Dkt. 37-2 at 4:110–12.)   Garza's 2007 declaration also states that Garza "has been the recommending official for other vacancies within the past two years" (id. at 5:167-68), but he does not specify his level of involvement in hiring decisions prior to 2005.

C. The August 2005 S-SPS Vacancy Announcement

On or about August 17, 2005, a job announcement for a vacant S-SPS position at the Port of Laredo appeared on the USA Jobs Internet Website for Federal Employment Opportunities. (Dkt. 37-3 at ¶ Q.)   The record does not contain a copy of this job posting.   However, in the undated declaration submitted with his response, Torralba avers that the "vacancy position was given job vacancy identification listing number 46327 and, a corresponding close date of August 19, 2005."   (Id.)   He also states that the "vacancy announcement was restricted to uniformed members of the Customs and Border Protection Division of the DHS."   (Id.)   The job announcement was subsequently

removed without the position being filled.  (Id.)  Torralba adds
that "[he] was number one on the best qualified list for that
job vacancy announcement," but that Garza "rejected the best
qualified list of applicants . . . and . . . cancelled this job
announcement."  (Dkt. 37-3 at ¶ Q.)[7]

### D. The February 2006 S-SPS Vacancy Announcement

On February 23, 2006, DHS posted a second job announcement
for the Laredo S-SPS vacancy, numbered MHC-106629-THE. (Dkt. 40-
3 at 1–2; see also Dkt. 1 at ¶ 32; Dkt. 8 at ¶ 31; Dkt. 37-3 at
¶ T.)  The record contains a copy of this job announcement
(Dkt. 40-3), as well as DHS's general "Description of Major
Duties and Responsibilities" for the S-SPS job.  (Dkt. 40-4 at
2.)  The February 2006 announcement does not require that
applicants be current uniformed members of CBP.  (Dkt. 40-3;
Dkt. 37-3 at ¶ R.)  The position was open to "[c]urrent [DHS]

---

[7]  Rule 56(e)(1), Fed. R. Civ. P., states that affidavits
supporting or opposing summary judgment "must be made on
personal knowledge, shall set forth such facts as would be
admissible in evidence, and shall show affirmatively that the
affiant is competent to testify to the matters stated therein."
Under Rule 602, Fed. R. Evid., a witness is not competent to
testify to a matter "unless evidence is introduced sufficient to
support a finding that the witness has personal knowledge of the
matter."   There is no evidence in the record showing how
Torralba could have personal knowledge of who was on the best
qualified list generated from the August 2005 job announcement,
or of who made the decision to cancel that announcement and why.
Moreover, there is no indication of how a "best qualified list"
is composed, nor of whether names on the list are ordered
according to merit.

employees with competitive status within the local commuting area," and "[c]urrent and former [DHS] employees within the local commuting area who meet the established criteria in an Office of Personnel Management Interchange Agreement." (Dkt. 40-3 at 2.)

The announcement explains that the Port of Laredo S-SPS would be "responsible for assuring the overall operation and success of the Seized Property Program," which "provid[es] . . . custody, management, and disposition of seized/forfeited property within the area of jurisdiction." (Id. at 3.) DHS's general description of an S-SPS's duties:

> [An S-SPS] supervises a subordinate staff of seized property specialists and custodians and as such assures the overall operation and success of the Seized Property Program of the District. The [S-SPS] provides administrative controls as well as serves as authoritative expert and primary contact point within the District/Area for procedures policies matters [sic] relating to the inventory and safe storage of seized illegal narcotics, prohibited goods maintenance restricted [sic] that has [sic] not met the requirements for entry.

(Id. at 1.) The February 2006 announcement states that an applicant must have at least one year of "specialized experience that equipped [him] with the skills needed to perform the job duties." (Dkt. 40-3 at 3.) The announcement offers the following "[e]xamples" of the required experience:

> conducting reviews of contractors, facilities, and/or operations involved with the custody, management and disposition of seized and forfeited property; evaluating

> contracts associated with seized property functions and
> making recommendations for changes that will improve
> operations; and handling complex and unique seized
> property situations such as those requiring special
> security procedures or emergency storage facilities.

(Id.)  The announcement also states that the Port of Laredo S-SPS's responsibilities would include "direct[ing] the on-site representatives of the Headquarters Contracting Officer's Technical Representative (COTR) regarding the contractor's responsibilities and performance under the national contract for the storage and sale of seized property."  (Dkt. 40-3 at 3.)  DHS has promulgated a "Management Directive" explaining the "Contracting Officer's Technical Representative" ("COTR") function.  Department of Homeland Security, MD No. 0780.1, Contracting Officer's Technical Representative (COTR) Certification, Appointment & Responsibilities (Dec. 12, 2004) (hereinafter "DHS MD 0780.1").[8]  A COTR is "a federal employee, designated in writing by the Contracting Officer, who is appointed to perform technical functions under the contract, including inspection and acceptance of supplies and services."

---

[8]  DHS MD 0780.1 is not in the record, however, it can be downloaded from DHS's website (http://www.dhs.gov/xfoia/gc_12545015890 35.shtm).  Cf. Coleman v. Dretke, 409 F.3d 665, 667 (5th Cir. 2005) (on denial of petition for rehearing en banc) (when determining whether a habeas petitioner convicted of simple assault could be required to participate in sex offender therapy as a condition of release, Fifth Circuit appellate panel could take judicial notice of state agency website to determine the nature of the therapy program).

DHS MD 0780.1 at 3.[9]   A COTR is normally "responsible for the
technical direction and evaluation of the contractor's
performance, and certifying acceptance of services."   DHS MD
0780.1 at 4.   DHS's general description of the S-SPS position
states that the S-SPS "[s]erves as the alternate (COTR) within
the District and determines recommendations for the District
Director's quarterly evaluation of the contractor's
performance."  (Dkt. 40-4 at 4.)   The parties agree that "[t]he
description of the qualifications and duties of the [S-SPS
position] advertised required a thorough knowledge of the
Agency's requirements for National Contractor's [sic]
performance of the contractor's duties with respect to the
contractor's responsibilities and performance for the storage,
sale and disposition of seized property."  (Dkt. 1 at ¶ 33;
Dkt. 8 at ¶ 2.)   However, the 2006 announcement and DHS's
general description of the S-SPS position indicate that
monitoring performance of DHS's storage contracts with private
entities is only a part of an S-SPS's duties, and Torralba
asserts that COTR duties make up "half" of those duties.
(Dkt. 40-3 at 3; Dkt. 40-4 at 2-5; Dkt. 37-3 at ¶ L.)   The
February 2006 job announcement does not state that applicants

---

[9] A "Contracting Officer" is "a Federal employee with the
authority to enter into, administer or terminate contracts; make
related determinations and findings; and appoint COTRs."   DHS
MD 0780.1 at 2.

must have a COTR certification to be eligible for the vacant S-SPS position. (Dkt. 40-3 at 1-4.) However, a DHS employee performing COTR duties is generally required to have a "COTR acquisition certification," or to complete the necessary training and acquire a certification within 60 days of employment. DHS MD 0780.1 at 4, 11.

Torralba submitted an application in response to the February 2006 announcement, as did Maria Laura Garcia, who was ultimately selected for the S-SPS position. (Dkt 1 at ¶ 43; Dkt. 8 at ¶ 2; Dkt. 40-1; Dkt. 40-2.)

### E. Torralba's Application

Torralba's February 2006 application states that he worked as a customs inspector in the Port of Laredo from January of 1992 until September of 1995. (Dkt. 40-1 at 3.) His duties included "inspecting and interviewing commercial air passengers, vehicle traffic, and pedestrians." (Id.) He "[f]unctioned as Group Leader in the Cargo Import Facility and efficiently processed commercial entries using our automated system"; he "[r]eceived several Contraband Enforcement Awards and Commendations"; and he was selected as a field training officer to train new inspectors. (Id.)

In 1995, Torralba was promoted to the position of seized property specialist at the Port of Laredo. (Dkt. 37-3 at ¶ G;

Dkt. 40-1 at 2.)[10]   Torralba had experience as a certified COTR
for ten years, monitoring storage services provided under a
national contract between the Government and EG/G Technical
Services.  (Id. at 2, 4.)  His duties also involved managing
seized property, resolving "contract performance discrepancies,"
and implementing "controls [sic] measures to eliminate fraud,
waste, abuse, mismanagement [sic] and inefficiency." (Id.)

   F. Garcia's Application

   Garcia's application indicates that from 1989 until 1999
she worked as an "Import/Export Clerk Manager" for ABACO
Customhouse Brokers, Inc., in Del Rio, Texas.  (Dkt. 40-2 at 3-
4.)  This job involved office management and bookkeeping, as
well as various administrative tasks related to importing and
exporting goods.  (Id.)  The application states that Garcia
interacted with the Customs Service on a daily basis, and kept
"up to date knowledge of all regulations concerning the trade
community." (Id. at 3.)

---

[10] On the second page of Torralba's application, he listed the
period of his employment as a seized property specialist as
"9/1992 to Present."  (Dkt. 40-1 at 2.)  The remainder of the
application and Torralba's declaration make clear that he became
a seized property specialist in September, 1995.  (See Dkt. 40-1
at 3; Dkt. 37-3 at ¶ G.)  It appears that he entered "9/1992 to
Present" rather than "9/1995 to Present" on the second page of
his application by mistake.

In 2000, the Customs Service hired Garcia as a customs technician. (Id. at 3.) Her duties involved administration of payroll, employee records, travel, and workers' compensation claims. (Id.) She was also responsible for keeping track of government vehicles and uniforms. (Id.) The record contains a second unsworn declaration from Torralba, dated October 8, 2010, in which he avers that Garcia was stationed at Garza's port administrative office during this time, and that Torralba "observ[ed] her on an almost daily basis." (Dkt. 40-5 at ¶ 5.) Torralba avers that Garcia "was not a uniform [sic] employee and had no law enforcement experience." (Id.)

In 2001, Garcia became a seized property specialist in the Customs Service's Office of Investigations. (Dkt. 40-2 at 2.) When the Customs Service's components were transferred to DHS in 2003, the Office of Investigations became part of Immigration and Customs Enforcement ("ICE"). (Id.) As a seized property specialist for ICE, Garcia was responsible for ensuring that seized property was properly stored and accounted for, for coordinating with various parties responsible for keeping seized property, and for "eliminate[ing] . . . potential mismanagement, abuse or waste of DHS controlled assets." (Id.) Garcia was posted in Laredo, but she "overs[aw] all the offices under the

San Antonio Special Agent in Charge." (Id.)[11]  This required
"[d]eal[ing] with Drug Enforcement Agents, Deputy U.S. Marshals,
Border Patrol, Alcohol Tobacco & Firearms and Secret Service
Agents," and maintaining "[c]ontacts . . . with contractors with
regard to goods held for criminal prosecution." (Id.)  Garcia
also "trained legacy INS agents during cross training on Seized
Property Program [sic]." (Id.)  Garcia's application does not
indicate that she had a COTR certification.  Torralba avers that
he observed Garcia "when she worked the ICE Department [sic],"
and that "[d]uring this time she performed no COTR duties and
responsibilities." (Dkt. 40-5 at ¶ 6.)  However, neither of
Torralba's declarations indicates how he could have observed all
of Garcia's job duties when she was working for ICE.

    G. <u>Garza Selects Garcia</u>

    Garza was responsible for reviewing the applications for
the February 2006 job announcement and recommending a selectee

---

[11] The following explanation of the structure of ICE's Office of
Investigations can be found on ICE's website:

    The Office of Investigations has 26 Special Agent in
    Charge (SAC) principal field offices throughout the
    United States. The SAC offices are responsible for the
    administration and management of all investigative and
    enforcement activities within the geographic boundaries
    of the office. ( . . . )
    To efficiently manage their designated geographic
    regions, SAC offices maintain various subordinate field
    offices throughout their areas of responsibility, which
    support the enforcement mission.

http://www.ice.gov/about/investigations/contact.htm.

to his immediate superior, David Higgerson.  (Dkt. 37-2 at 3:47–66; Dkt. 28-3 at ¶ 64.)   Garza had a subordinate check the applicants' references.    (Dkt. 37-2 at 3:63-4.)    He then "reviewed the reference checks and the applicant's [sic] applications and made the recommendation . . . ."  (Id. at 2:62–6.)   Although Garza considered Torralba's application, he ultimately recommended Garcia for the position, and Higgerson hired her.  (Id. at 3:73–76, 3:54–56; Dkt. 28-3 at ¶ 36.)

Garza avers that he "recommended Garcia over Torralba for the position because Torralba did not have the same overall level of experience in the Seized Property Program."  (Dkt. 37-2 at 3:78-87; 3:91-4:92.)  Garza explains:

> Torralba's level of experience stems from working in the
> seized property program under the supervision of a
> Seized Property Supervisor at a particular port of
> entry.  Ms. Garcia, on the other hand, was responsible
> for several Office of Investigation offices throughout
> the Special Agent in Charge ("SAC") area, thus gaining a
> higher level of experience/responsibility in the Seized
> Property Program.

(Id. at 3:82–87.)   Garza also offers the following, more specific reasons for his decision:

> * As a supervised property specialist for ICE, Garcia
>   "provided custody, oversight, management and disposition
>   of seized or forfeited property for most of South Texas,
>   including San Antonio, Del Rio, Laredo, Roma, Pharr, and
>   Brownsville."  (Dkt. 27-3 at 3.)
> * When working for ICE Garcia "worked with Special Agents
>   from DHS's Immigration and Customs Enforcement, the Drug
>   Enforcement Administration, the Bureau of Alcohol, Tobacco
>   and Firearms, the U.S. Marshals Service, the Secret
>   Service, and the Border Patrol."

* Garcia "also trained Immigration and Customs Enforcement agents that acted as Collateral Evidence Custodians, and legacy Immigration and Customs Enforcement agents in the Seized Property Program." (Id.)

* Garza spoke to Garcia's supervisor at ICE, Janice Ayala, who "said that Ms. Garcia was an outstanding employee and confirmed the broad experience described in Ms. Garcia's application."  Ayala told Garza she was trying to upgrade Garcia's salary in order to retain her at the Office of Investigations.  (Id.)

In his 2007 declaration, Garza avers that he did not remember Torralba's 2002 complaint when he decided to recommend Garcia for the S-SPS position.  (Dkt. 37-2 at 2:36-40, 4:116-117.)  After Garcia was hired, Torralba was responsible for "teach[ing] her the basics of COTR duties, responsibilities, and the terms of the DHS Contract with private sector federal contractors . . . ."  (Dkt. 37-3 at ¶¶ V, M, X.)  It was evident to Torralba that Garcia had no experience monitoring private entities' performance of their storage contracts with DHS. (Id. at ¶¶ V, X.)

Torralba alleges that Garza selected Garcia rather than Torralba because Torralba is male and to retaliate for Torralba's 2002 EEO complaint. (Dkt. 1 at ¶¶ 49-50; 75-90; Dkt. 37 at 2-3.)

### III. DISCUSSION

#### A. Applicable Law

When considering summary judgment in a Title VII retaliation or discrimination action, courts employ the burden-shifting framework established in <u>McDonnell Douglass Corp. v. Green</u>, 411 U.S. 792, 802-06 (1973); <u>see also</u> <u>McCoy v. City of Shreveport</u>, 492 F.3d 551, 556 (5th Cir. 2007) (applying the <u>McDonell Douglass</u> framework to discrimination and retaliation claims.)

A Title VII plaintiff must first establish a prima facie case of discrimination or retaliation.   A prima facie case of discrimination requires a showing that the plaintiff (1) is a member of a protected group; (2) was qualified for the position at issue; (3) was discharged or suffered some adverse employment action by the employer; and (4) was replaced by someone outside his protected group or was treated less favorably than other similarly situated employees outside the protected group. <u>McCoy</u>, 492 F.3d at 556.   The prima facie case of a Title VII retaliation claim consists of a showing that: (1) "the plaintiff engaged in activity protected by Title VII, (2) that an adverse employment action occurred, and (3) that a causal link existed between the protected activity and the adverse action". <u>Gee v. Principi</u>, 289 F.3d 342, 345 (5th Cir. 2002).

If the plaintiff meets its burden with respect to the prima facie case, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory or nonretaliatory reason for its employment action." McCoy, 492 F.3d at 558. "The employer's burden is only one of production, not persuasion . . . ." Id.

If the employer meets its burden of production, the plaintiff can avoid summary judgment in two ways. The plaintiff can offer sufficient evidence to create a genuine issue of material fact as to whether the employer's proffered reason is merely a pretext for the real discriminatory or retaliatory purpose. Id. Alternatively, the plaintiff can offer evidence that the defendant's articulated reason was only one of the reasons for its conduct, and that a discriminatory or retaliatory purpose was also a motivating factor. Id.[12]

A plaintiff may show pretext by showing that the employer's proffered explanation is "false or 'unworthy of credence.'" Moss v. BMC Software, Inc., 610 F.3d 917, 922 (2010) (quoting Jackson v. Cal-Western Packaging Corp., 602 F.3d 374, 378-79

---

[12] A plaintiff may avoid summary judgment on a mixed-motives theory with either direct or circumstantial evidence of discrimination or retaliation. Desert Palace, Inc. v. Costa, 539 U.S. 90, 101 (2003) (direct evidence not necessary to proceed with a mixed-motives theory in a Title VII discrimination case); Smith v. Xerox Corp., 602 F.3d 320, 330 (5th Cir. 2010) (direct evidence not necessary to proceed with a mixed-motives theory in a Title VII retaliation case).

(5th Cir. 2010)). "An explanation is false or unworthy of credence if it is not the real reason for the employment action." Laxton v. Gap Inc., 333 F.3d 572, 578 (5th Cir. 2003).

Generally, courts must focus on the final decision when determining whether an adverse employment action was taken as a result of retaliation or discrimination. See Gee, 289 F.3d at 346. However, in appropriate cases a subordinate's discriminatory or retaliatory motives can be imputed to a final decision maker whose action is merely a "rubber stamp" for the subordinate's recommendation. See id.; Rios v. Rossotti, 252 F.3d 375, 382 (5th Cir. 2001). Imputing a subordinate's motives to the ultimate decision maker is appropriate if the plaintiff can demonstrate the subordinate "'had influence or leverage'" over him. Rios, 252 F.3d at 382 (quoting Russell v. McKinney Hosp. Venture, 235 F.3d 219, 226 (5th Cir. 2001)). In this case, both parties focus almost exclusively on Garza's reasons for recommending Garcia to Higgerson, and neither party has submitted evidence indicating that Higgerson made his decision on any other basis. The Court accordingly focuses on Garza's decision to recommend Garcia and his reasons for doing so.

B. <u>Prima Facie Case</u>

The Government concedes that Torralba has established a prima facie case of gender discrimination. (Dkt. 27 at 6-7.)[13] With respect to the retaliation claim, Torralba engaged in an activity protected by Title VII when he filed the 2002 EEO complaint, and he experienced an adverse employment action when he was not selected for the S-SPS position. <u>See</u> 42 U.S.C. §§ 2000e-2(a)(1), 2000e-3(a). However, the Government asserts that Torralba cannot show a causal link between his 2002 EEO complaint and the 2006 decision not to select him for the S-SPS position. (Dkt. 27 at 5.) The causal-link element of the prima facie case for Title VII retaliation is "'much less stringent than a but for causation standard.'" <u>Ackel v. Nat'l</u>

---

[13] Specifically, the Government concedes that Torralba (1) "is a male belonging to a protected group, (2) applied and was qualified for the [S-SPS] position, (3) though qualified, he was rejected, and (4) thereafter, CBP continued to seek applicants with Torralba's qualifications." (Dkt. 27 at 6-7.) In this case, the 4th element of CBP "continu[ing] to seek applicants with Torralba's qualifications" does not comfortably fit because applicants could apply for the February 2006 vacancy posting only from February 10, 2006 until February 24, 2006. Suffice to say that Garza necessarily considered applicants during the process of deciding that he would not recommend Torralba. The Supreme Court uses a very similar formulation of the 4th element in <u>McDonnell Douglass</u>, 411 U.S. at 802 ("that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complaintant's qualifications.") However, the Court noted that that "[t]he facts will vary in Title VII cases, and the specification above of the prima facie proof required from [a Title VII plaintiff] is not necessarily applicable in every respect to different factual situations." <u>Id.</u> at 802 n.13.

Communications Inc., 339 F.3d 376, 385 (5th Cir. 2001) (quoting
Fierros v. Tex. Dep't of Health, 274 F.3d 187, 191 (5th Cir.
2001)).  However, the plaintiff must produce some evidence of a
link between the protected activity and the adverse action.  Id.
Temporal proximity alone can suffice, but only if the timing of
the events is much closer than the nearly 4-year interval in
this case.  E.g. Clark County School Dist. v. Breeden, 532 U.S.
268, 273-74 (2001) (20 months too great an interval between
protected activity and adverse action).  However, the Fifth
Circuit has held that a Title VII retaliation plaintiff can show
the causal link with evidence that the manager who terminated
the plaintiff knew of the protected activity, because such
evidence demonstrates that the complaint and the adverse action
were "not wholly unrelated."  Medina v. Ramsey School Company,
Inc., 238 F.3d 674, 684 (5th Cir. 2001).  Although Garza avers
in his 2007 declaration that he did not remember Torralba's 2002
complaint when he recommended Garcia for the S-SPS position
(Dkt. 37-2 at 2:36-40, 4:116-117, 124-132), in his 2002
affidavit Garza does concede that he had been informed of
Torralba's EEO Complaint at that time.  (Dkt. 37-1 at 9.)
Accordingly, Torralba has made a sufficient showing that his
2002 EEO complaint and the decision to not promote him to S-SPS
were not wholly unrelated.

C. Pretext/Mixed Motives

Garza's explanation of his reasons for recommending Garcia meets the Government's burden of production with respect to a legitimate, nondiscriminatory reason for Garza's decision. (Dkt. 37-2 at 3:82–87, 3:91–4:92; Dkt. 27-3 at 3.)   Torralba therefore bears the burden to show that there is some evidence that Garza's explanation is pretextual or that Garza acted out of mixed motives.   Torralba attempts to meet this burden with three arguments.

First, Torralba argues that the fact that the uniformed-CBP-employee requirement in the August 2005 announcement was not included in the February 2006 announcement shows pretext, because removing that requirement made Garcia eligible to apply for the position.   (Dkt. 37 at 10-11; Dkt. 37-3 at ¶ 3.)   The record contains no evidence of who was responsible for posting the job announcements and for determining their contents.   There is no evidence in the record that Garza himself eliminated the requirement, nor that he did so in order to have more female applicants, or more who had not engaged in EEO activity. Assuming it was Garza who cancelled the 2005 posting and removed the requirement, Torralba's argument is nonetheless unavailing. Even if Garza eliminated the requirement specifically to accommodate Garcia, that alone does not evince an impermissible motive to discriminate against male applicants.   The record

contains no evidence that eliminating the requirement yielded an applicant pool with a greater proportion of female applicants. Namely, there is no evidence as to the number, gender, and uniformed status of all the applicants who responded to the 2005 and 2006 postings.

Torralba avers that from 1995 until 2006, "all of [his] supervisors and directors have been females," and that most if not all of those persons were promoted by Garza.  (Dkt. 37-3 at ¶ N.)  The Port Director is Torralba's "third-level" supervisor (Dkt. 37-2 at 1:16–34), which the Court takes to mean that there are two "supervisors and directors" in the chain of command between Torralba and the Port Director.  Torralba's averment therefore shows only that two positions in the Seized Property Section have been continuously occupied by women since 1995, and that the women who occupied those posts were promoted by Garza. Torralba has submitted no evidence as to how many different women have occupied these posts, nor any evidence that women were promoted to these posts over qualified male applicants.

In his 2007 declaration, Port Director Garza concedes that "all managers within the CBP Seized Property Section (PSS) are female."  (Dkt. 37-2 at 4:114–15.)  There is no evidence in the record regarding how many managers the Seized Property Section has, nor of when they were hired.  Garza's concession merely shows that in 2007 an unspecified number of women occupied all

of the management positions in the Seized Property Section. There is no evidence that they were promoted to their posts over qualified male applicants.

Torralba identifies four female applicants who have been selected over him for various positions filled between 2002 and 2005. Torralba offers no evidence that discrimination was involved in these decisions, beyond the fact that a woman was hired and at least one male (Torralba) applied. He offers no evidence of the requirements for those positions, of the female selectees' credentials, or the credentials of other male applicants. Moreover, the record does not disclose how many other staffing decisions Garza made for 700-person facility between 2002 and 2005, in comparison to the four noted by Torralba.

Second, Torralba argues that Garcia "lacked both the requisite COTR credentials and experience required as a qualification in the vacancy announcement." (Dkt. 37 at 11.) A Title VII plaintiff can show pretext by contrasting his credentials with those of the person selected for the position he sought. Scott v. Univ. of Miss., 148 F.3d 493, 508 (5th Cir. 1998). However, differing qualifications constitute evidence of pretext only if they show that the plaintiff was "'clearly better qualified (as opposed to merely better or as qualified.)'" E.E.O.C v. La. Office of Cmty. Servs., 47 F.3d

1438, 1445 (5th Cir. 1995); <u>see also</u> <u>Moss</u>, 610 F.3d at 922.  The comparison must reveal glaring distinctions between the plaintiff's and the selected applicant's qualifications.  <u>Scott</u>, 148 F.3d at, 509 (quoting <u>La. Office of Cmty. Servs.</u>, 47 F.3d 1438, 1445 (5th Cir. 1995)), *overruled on other grounds by* <u>Kimel v. Fla. Bd. Of Regents</u>, 528 U.S. 62 (2000).  The Fifth Circuit has explained that "the bar is set high for this kind of evidence because differences in qualifications are generally not probative evidence of discrimination unless those disparities are 'of such weight and significance that no reasonable person, in the exercise of impartial judgment, could have chosen the candidate selected over the plaintiff for the job in question.'" <u>Celestine v. Petroleos de Venezuela, S.A.</u>, 266 F.3d 343, 357 (5th Cir. 2001) (quoting <u>Deines v. Tex. Dept. of Prot. & Regulatory Servs.</u>, 164 F.3d 277, 281-82 (5th Cir. 1999)).

A comparison of Torralba's and Garcia's applications does not reveal any glaring distinction that would satisfy the clearly-better-qualified standard.  Both were employed as seized property specialists, responsible for the custody, management, and disposition of seized or forfeited property.  Torralba had eleven years of experience as a seized property specialist and Garcia had only five, but Garcia had been responsible for overseeing seized and forfeited property at multiple offices and

dealt with officers from several federal agencies.  (Dkt. 37-3 at 2; Dkt. 40-2 at 2.)

Garcia's application would have been stronger had she been able to claim certification or COTR experience comparable to Torralba's, but the February 2006 announcement did not require that applicants already be certified in order to be eligible.[14] Also, Garcia's application indicates that she had some experience dealing with contractors as a seized property specialist for ICE.  (Dkt. 40-3 at 2-6; 40-2 at 2.)  Torralba avers she did not.  (Dkt. 40-5 at ¶ 6.)  However, as previously stated, _supra_ p. 15, there is no evidence to explain how Torralba is competent to testify as to the nature of all of Garcia's duties throughout her five years as an ICE seized property specialist.[15]  Moreover, there is no indication that Garza was privy to Torralba's observations about Garcia's experience.  His decision was based on her application and the recommendation of her supervisor at ICE, who "confirmed the broad experience described in [Garcia's] application," and said

---

[14] Torralba asserts that Garcia "lacked both the requisite COTR credentials and experience required as a qualification in the vacancy announcement."  (Dkt. 37 at 11.)  While COTR duties make up a major part of the duties described in the 2006 posting, Torralba is incorrect to the extent that he suggests that a COTR certification was required in the announcement.

[15] Both worked in Laredo, Texas, but for different agencies, and Torralba's declarations do not establish how he would have personal knowledge of all of the tasks Garcia performed during her five years with ICE.  See Rule 56(e)(1), Fed. R. Civ. P.

that she was trying to get permission to increase Garcia's salary in order to retain her. (Dkt. 27-3 at 3.)

Torralba avers that after Garcia was hired, he had to teach her "the basics" of COTR duties and it was evident that she had no experience monitoring private contractors' storage of seized property. (Dkt. 37-3 at ¶¶ V, X.) Shortcomings that came to light after Garcia was hired do not shed light on Garza's motives for hiring her. Moreover, she remained a viable candidate even if Garza believed she had no experience monitoring private contractors' storage and care of seized property, because her application indicates extensive direct experience with the type of task those contractors perform, and with the regulations, facilities, and government agencies involved. Garcia's application was also bolstered by her experience with inventory and office management, and the fact that at ICE she had been responsible for seized property at locations throughout South Texas. (Dkt. 27-3 at 3; Dkt. 40-2 at 3.) A reasonable employer could have selected Garcia for the S-SPS position in spite of her need for COTR training and certification.

Third, Torralba argues that Garza's statements in his 2002 affidavit and his 2007 declaration give rise to "a credibility issue" that precludes summary judgment:

The credibility issue is the contrast between the affidavit/declaration taken from Garza in during [sic] the investigation of Plaintiffs [sic] 2002, EEO Charge [sic] in which he professes knowledge of Plaintiffs EEO Activity with that taken in 2006,[16] when he selected Garcia and professed no knowledge or recollection of any Prior [sic] EEO activity by Torralba an employee whom he supervised for ten plus years.

A jury is entailed [sic] to determine whether his denial of any recollection of Plaintiffs [sic] prior EEO Activity is worthy of credence.

(Dkt. 37 at 11.)  A Title VII plaintiff can show pretext by pointing to inconsistent explanations for an employment decision offered at different times.  Gee, 289 F.3d at 348.  Torralba is correct that Garza's statements in his 2002 affidavit that he had become aware of Torralba's 2002 EEO complaint sufficed for the "causal link" step of Torralba's prima facie case of retaliation, but it does not constitute evidence of pretext.  See Medina v. Ramsey Steel Co., Inc., 238 F.3d 674, 684 (5th Cir. 2001) (plaintiff's burden at the pretext stage is more demanding than the "causal link" step in the prima facie case).  Awareness in 2002 of Torralba's EEO complaint is not inconsistent with Garza's 2007 statement that he did not recall the EEO complaint several years later.  (Compare Dkt. 27-3 at 3; with Dkt. 37-3 at 3:81-87.)  The statements do not constitute

---

[16]  The Court understands Torralba's argument as referring to Garza's declaration made in 2007. (Dkt. 37-2.)  The record contains no declaration from Garza made in 2006.

evidence that the explanation Garza has offered for his decision is false or not worthy of credence.

## IV. CONCLUSION

For the reasons stated above, the Government's motion for summary judgment is GRANTED with respect to Torralba's discrimination and retaliation claims.

DONE at Laredo, TX, this 18th day of November, 2010.


George P. Kazen
Senior United States District Judge